COMMONWEALTH vs. A JUVENILE.

Suffolk.   September 18, 1985. — November 19, 1985.

Present: KASS, KAPLAN, & SMITH, JJ.

*Practice, Criminal,* Instructions to jury. *Witness,* Child, Police officer. *Evidence,* Cross-examination.

At the trial of a juvenile charged with throwing bricks at a police officer, in which there was a conflict between the defendant's testimony and testimony by the police officer and a twelve year old witness, the judge did not abuse his discretion in refusing to elaborate on his general instructions on the credibility of witnesses to deal more particularly with the credibility of police officers and child witnesses, where witness credibility was highlighted and vigorously explored throughout the trial, where the case did not stand solely on the credibility of the witnesses but had corroborative elements including physical evidence, and where the judge's general instructions on credibility were correct and adequate. [124-127]

At the trial of a juvenile charged with throwing bricks at a police officer, the judge did not abuse his discretion in limiting cross-examination of the police officer with respect to his emotional condition after the event in question in light of the length and scope of the cross-examination which covered the possible effects of stress and emotion on the officer's observations and his memory. [127-128]

COMPLAINT received and sworn to in the West Roxbury Division of the District Court Department on August 22, 1983.

On appeal to the Boston Division of the Juvenile Court Department, the case was tried before *Mark E. Lawton, J.*

*Michael Avery* for the defendant.

*Marcy Cass,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendant juvenile, whom we shall call Alex, aged fourteen at the time, was complained of in the District Court in West Roxbury for delinquency, in that he was alleged to have committed assault and battery with a

dangerous weapon, to wit, a red chimney brick, upon Thomas Richardson; the same, upon Robert Lombardi; and assault with the like dangerous weapon upon Thomas Richardson. After being found guilty at a jury-waived trial, the defendant, upon appeal to a jury-of-six session in the Appellate Division of the Juvenile Court in Boston, was acquitted of the assault and battery charges, but convicted of the assault charge. He was adjudged delinquent and sentenced to a term of unsupervised probation.

1. The main question on this appeal is whether the trial judge committed error when he declined to elaborate on his general instructions on the credibility of witnesses to deal more particularly with the credibility of police officers (the complainant, Boston police Officer Thomas Richardson, being the one in question) and child witnesses (Richard Flores, called by the prosecution). We hold that the judge acted within his reasonable discretion, and did not err.

(a) To sketch the background, we first summarize briefly the direct testimony of the two witnesses mentioned, and of the defendant as well. Officer Richardson testified that on August 20, 1983, about 10:05 P.M., he and Officer Sherman Griffiths, in a patrol wagon, went to 108 Williams Street, Jamaica Plain, to answer a call about a loud party there. They entered an apartment on the second floor of a barnlike building where a party of teenagers was in progress, and tried to get the noise moderated. Robert Lombardi, drunken and abusive, became violent, and they arrested him. A young man, also drunk, attempted to wrest Lombardi from Officer Griffiths. Then, as the two officers were conducting Lombardi down the stairs, Richardson heard a sound and saw Griffiths slump. He had been struck by a bowl flung from the landing above. Richardson led Lombardi outside. As the two reached the back of the patrol wagon, Richardson heard the thud of a heavy object falling upon the roof of the wagon. Then a brick struck his left hand. He heard another impact and Lombardi dropped to his knees. As Lombardi shouted toward the roof of the building, Richardson looked there and saw two figures near a chimney, one standing upright, the other bent over as if to pick

something up. Turning to attend to Lombardi, Richardson was struck by a brick on his right arm.[1] He looked again at the roof and saw two figures with their arms raised in a position to throw; each had an object in hand. Richardson yelled for them to "drop the shit," but they did not. In fear of his life, as Richardson testified, he drew his .38 revolver and fired at the nearer figure. After the flash of the gun, Richardson looked at the roof; it was empty. He heard shouts that someone had been shot, and saw Griffiths on the roof signalling with a flashlight.[2]

Richard Flores, aged eleven, attended the party. He identified the youth who by Richardson's testimony had struggled over Lombardi, as Frank, brother of the defendant Alex. Looking through double doors of the living room leading to the roof, he saw Frank and Alex near the chimney. They were throwing pieces of tar down at the cops, picking the stuff from the front wall and floor of the roof. They did this ten times. He saw Alex fall. Frank, yelling that Alex was shot, fled the roof. He saw Frank after the ambulance came; Frank had changed his pants.[3]

Testifying on his own behalf, the defendant said he appeared at the party some time after his brother Frank. He identified Frank as the drunken fellow who fought over Lombardi and very likely threw the bowl. A few moments later he saw Frank headed for the double doors opening to the roof, and climbed through a window onto the roof intending to get Frank to go home before he did something stupid. He saw Frank's "shadow" near the chimney. Frank threw something over the ledge and there was loud crash.[4] Before he could speak to

---

[1] Other testimony indicated that the source of the bricks found in the vicinity of the wagon was a ramshackle chimney on the roof.

[2] After being stunned on the stairs, Griffiths returned to the apartment and went out to the roof when he heard the gunshot.

[3] There was testimony that Frank and Alex lived at home, a short distance from 108 Williams Street.

[4] On cross-examination, the defendant said also that he saw Frank pick something up near the chimney and then heard a thud and saw a figure below fall to his knees.

Frank he was felled by a bullet that struck him on the left side of his face. He was ministered to by Officer Griffiths on the roof before the ambulance arrived. He, the defendant, had not thrown anything from the roof.

There was apparent conflict in the testimony of these main witnesses, and it was clear almost from the outset that the credit to be given them (with the related matter of the weight to be accorded their testimony) was going to be important to decision. Direct and (above all) cross-examination centered on credibility factors. As we indicate below, cross-examination was extensive and searching. The closing statements of counsel, especially that of defense counsel, bore down on credibility.

In this setting, the judge gave instructions on the subject which cannot be claimed to have been themselves incorrect or inadequate.[5] Thus, the jury were told in effect that, as sole assessors of credibility, they should consider the appearance, demeanor, and conduct of witnesses while they testified; the apparent intelligence or understanding of witnesses, and in this connection they were to take note of a witness's age; the opportunity of witnesses to observe phenomena, and the accuracy of their recollections; their frankness in recounting their observations; their motives or bias in testifying; their interest or lack of it in the outcome; and the probability and reasonableness of the content of their testimony. The judge charged also about the effect of prior inconsistent statements of a witness (and about possible rehabilitation); and, lastly, about testimony regarding a defendant's reputation in his community.

(b) The issue is whether the jury were sufficiently alerted to their duty and fairly advised about it. A general charge on credibility has been regularly considered enough for these purposes. See *Commonwealth* v. *Desmond,* 345 Mass. 774 (1963);

---

[5] The instructions conformed substantially with those set out (at 2.07) in the collection, Model Jury Instructions for Criminal Offenses Tried in the District Court Department (1980), prepared by that department and distributed as an aid to judges. See *Commonwealth* v. *Avery,* 14 Mass. App. Ct. 137, 143 n.3 (1982). The instructions, in addition, referred to the factor of age, as we mention below.

*Commonwealth* v. *McColl,* 375 Mass. 316, 321 (1978); *Commonwealth* v. *Allen,* 379 Mass. 564, 585 (1980); *Commonwealth* v. *Weaver,* 395 Mass. 307, 313 (1985). However, there should be no bar to additional specific instructions about classes of witnesses provided these do not create imbalance, or indicate the judge's belief or disbelief in the given witness, thereby ousting the jury from their authentic and traditional role as the sole arbiters of credibility. See *Commonwealth* v. *Perez,* 390 Mass. 308, 319-321 (1983); *Commonwealth* v. *Rodriguez,* 6 Mass. App. Ct. 738, 742-743 (1978), *S.C.* 378 Mass. 296 (1979).[6] The trial judge, closer to the facts and the atmosphere than an appellate court, may be trusted with a discretion whether to stick with general instructions or to make a closer approach. See *Commonwealth* v. *Avery,* 14 Mass. App. Ct. 137, 143 (1982).[7]

A case or type of case may be conceived of where the judge would be bound to particularize on the issue of credibility, although we find no such instance portrayed in our decisions. The present case, however, is conspicuously not a candidate for exceptional treatment — this for the principal reason that witness credibility was highlighted and vigorously explored throughout the trial, and could not have failed to attract and engage the active consideration of the jury. Moreover, the case did not stand on naked credibility of the witnesses but had corroborative elements including physical evidence. See the references to the factors of strong interrogation and corrobora-

---

[6] Examples of imbalance can be found in *Commonwealth* v. *Cote,* 5 Mass. App. Ct. 365, 369 (1977); *United States* v. *Reid,* 410 F.2d 1223, 1228 (7th Cir. 1969). Cf. *Collins* v. *Baron,* 392 Mass. 565, 570 (1984).

[7] The defendant cites actions in Federal courts under 42 U.S.C. § 1983 (1982) claiming damages against police officials where it was thought necessary to instruct juries that the defendants stood equal in law with their accusers (and other persons). These cases are special and are not directed to the question of credibility. See *Kerr* v. *Chicago,* 424 F.2d 1134, 1138-1139 (7th Cir.), cert. denied, 400 U.S. 833 (1970). Cf. *Roberts* v. *Hollocher,* 664 F.2d 200, 203 (8th Cir. 1981).

Other Federal cases cited by the defense deal with questions to jurors on empanelment, not with instructions. *Brown* v. *United States,* 338 F.2d 543 (D.C. Cir. 1964); *United States* v. *Baldwin,* 607 F.2d 1295 (9th Cir. 1979); *Darbin* v. *Nourse,* 664 F.2d 1109 (9th Cir. 1981).

tive proof in *United States* v. *Kavanagh,* 572 F.2d 9, 12 (1st Cir. 1978); *United States* v. *Rosa,* 705 F.2d 1375, 1382 (1st Cir. 1983).[8] On the record at bar, a detailed charge would be unnecessary if not unwise.

(i) In *Commonwealth* v. *Avery,* 14 Mass. App. Ct. at 143-145, we held that the trial judge could properly decline to give a specific charge about the credibility of a child witness,[9] and we follow that decision here in laying stress on the vigorous pursuit and analysis that the relevant testimony in fact received during trial. At the insistence of defense counsel, the judge forbade the prosecutor to lead the witness Flores. Cross-examination was intensive almost to the point of harshness. For example, it brought out that the police had to some extent rehearsed or coached the witness; that he had been paying attention to a television program while the fracas occurred; that he could not recall certain facts as he might be expected to do; and that he did not actually see the defendant throw a brick. Flores was given little quarter on account of his age. His youth was duly dwelt upon in the closing statement for the defense. We should add (as noted above) that the judge mentioned age in his charge; in the light of the trial as a whole he hardly needed to sermonize upon it.[10]

(ii) Officer Richardson was emptied of all his recollections of what he had observed on the roof prior to the shooting. He was confronted with his prior statements putting in question whether he saw both persons with bricks in their hands, or but one, and if one, whether that person stood to the left or right. Similarly Richardson was quizzed on his prior statements about whether he fired at the person on the left or right. All this bore

---

[8] As suggested in these cited cases, further contraindicators of a need for specific instructions on credibility are (as here) solid instructions on the presumption of innocence and burden of proof.

[9] The defense offered model instruction 4.03, which is stated to be optional, not of right.

[10] In arguing for a child-witness charge, the defense naturally directs itself to Flores, a Commonwealth witness (eleven when the episode occurred, and twelve at trial). It may be observed that the defendant might also qualify as a child (fourteen, sixteen).

on the precise connection of the defendant to the bricks cast from the roof. Richardson had had an encounter earlier that night with four armed suspects in a car that might have put him under stress as he approached 108 Williams Street and could have accounted in some part for his lethal reaction to the brick throwing. He had a sensation of fear immediately before he fired. These matters were explored in cross-examination to show that his observations and recall could have been confused. To show bias and interest the examiner brought out that at the time of trial Richardson was facing departmental investigation about the shooting.[11] We note, finally, that whereas the judge did not advert in particular to the credibility of police officers in his instructions to the jury, he had, during empanelment proceedings, put to prospective jurors the question whether, in a criminal trial, "you think the testimony of a police officer is more likely to be truthful than the testimony of a Hispanic defendant."[12] This, we suggest, served much the same purpose as a specific instruction would have done.[13]

2. Defendant's counsel asked Richardson: "After this shooting, you took off work for a period of three months, isn't that right?" Answer, yes. Then followed: "And of those three months that you were off work, precisely four days, you took off because of your physical injury, isn't that correct?" The judge sustained the Commonwealth's objection to this question, and there was an offer of proof that during the three months Richardson consulted three times with psychologists. Probably it would not have been error for the judge to allow the interro-

---

[11] The defense makes the curio is suggestion that the general charge was out of balance because its references to motive and interest pointed to the defendant's motive to fabricate. It is one answer that the charge was relevant to Richardson, too, insofar as he was seeking vindication for the shooting.

[12] Also put to the jurors was the question whether Hispanic witnesses were "as likely to be truthful as other witnesses," and the further question whether Hispanics were "more, or less, likely to commit crimes than other people."

[13] Under *Commonwealth* v. *Szczuka,* 391 Mass. 666, 672 (1984), the question quoted in our text is optional, not required, in jury empanelment. This tends to confirm that a specific charge about police-officer testimony remains also optional.

gation, but considering the length and scope of the cross-examination to that point, covering the possible effects of stress and emotion on Richardson's observations and his memory of them, we think the judge could properly disallow the questions in his discretion. See *Commonwealth* v. *Repoza,* 382 Mass. 119, 125 (1980); *Commonwealth* v. *Perrault,* 13 Mass. App. Ct. 1072, 1073 (1982). There must be an end to cross-examination, as to litigation.

In conclusion, there is no contention that the evidence was insufficient to support the verdict and judgment, and the claims of error are without merit.

*Judgment affirmed.*